## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )      Case No. 05-CR-72-TCK |
| | ) |
| JOHN WESLEY CHAMBERS, | ) |
| | ) |
| | ) |
| Defendant. | ) |

### ORDER

Defendant John Wesley Chambers ("Chambers") is charged in a five-count Indictment with one count of Felon in Possession of Firearm and Ammunition in violation of 18 U.S.C. §922(g)(1); one count of Unlawful User of a Controlled Drug in Possession of a Firearm in violation of 18 U.S.C. § 922(g)(3); one count of Conspiracy to Manufacture Methamphetamine in violation of 21 U.S.C. § 846; and two counts of Using Firearm During and In Relation to a Drug Trafficking Crime in violation of 18 U.S.C. § 924(c)(1)(a)(I) and 18 U.S.C. § 924(c)(1)(C)(I).  Defendant moved to suppress evidence seized by law enforcement officers pursuant to a service of a search warrant on May 24, 2004, at 5:30 p.m. at Chambers' residence in Burbank, Oklahoma.  A hearing was held on the motion to suppress on November 21, 2005.[1]

### Factual Background

A.    First Search of Chambers' Residence

According to the testimony of United States Deputy Marshal Charles McNeil ("McNeil"),

---

[1]  At the conclusion of the hearing, the Court allowed Defendant to submit supplemental briefing if desired no later than December 2, 2005.  Defendant did not submit supplemental briefing.

the following events occurred related to the first search of Chambers' residence.  On April 1, 2004, Darrell Omar ("Omar") and Loc Ly ("Ly") escaped from Logan County Jail.  Ly was captured.  Ly informed members of the Oklahoma City Metro Fugitive Task Force ("Task Force") that Omar had taken a cab from Tulsa to Ponca City on April 2, 2004.  Ly also informed Task Force officers that Omar was "crazy" and had threatened to shoot police officers who tried to detain him. An informant advised Task Force officers that Omar was staying at the residence of Chambers, which is in Burbank, Oklahoma (a town near Ponca City, Oklahoma).

On April 7, 2004 beginning at approximately 10:30 p.m., approximately fifteen officers staked out Chambers' residence in an attempt to locate Omar and execute a warrant for his arrest. The residence was approximately sixty yards from the road, and there were numerous vehicles and boats in the back of the residence.  Officers were positioned in back of the house, on the side of the house, in neighbors' yards to the south and west of the house, and in front of the house.  The "take down team" consisted of several members of the Osage County Drug Task Force.  Also present were Oklahoma City police officers.  Members of the  "take down team" were dressed in camouflage fatigues and ballistic vests with a "police" label.  They were armed with automatic weapons and sidearms.

At approximately 2:00 a.m. on April 8, 2004, Chambers arrived at his residence in his pickup truck.  When Chambers exited the truck, he was ordered to the ground by officers at the front of the house.  Instead of complying, he fled on foot to the back of the house.  Officers at the front of the house radioed to officers at the back of the house, stating that Chambers was running and that he was coming toward them.  Once Chambers was within sight of officers at the back of the house, those officers ordered him to the ground.  Chambers stopped running at that point but did not comply with

2

the order to get on the ground.  Chambers was then forced to the ground by officers with their weapons drawn and was handcuffed.  McNeil testified the forcible restraint at this point was necessary because they did not know the location of Omar, and officers had been informed that Chambers kept a gun in his truck.

While restrained on the ground, Chambers denied knowing Omar.  Chambers then asked if he could sit down somewhere.  Officers McNeil and Duncan escorted Chambers to a well house beside the residence and began asking him questions.  During this questioning, Chambers was handcuffed.  Two officers, Duncan and McNeil, conducted most of the questioning, and their weapons were on their person but not drawn.  The officers explained to Chambers that they were looking for Omar, who was an escaped convict, and that they had reason to believe Omar was staying with Chambers.   They then asked Chambers if they could search his residence.  Chambers responded by saying that he did not know Omar and that they were "welcome" to go in the residence and look around.  No weapons were drawn during the questioning, and McNeil described the atmosphere of the questioning as calm and cooperative.  Officers did not make threats or use physical force while obtaining Chambers' consent to search the house.

After consent was given to search the house, officers ordered any occupants out of the house.  Two people exited the house:  Hailie Courtney ("Courtney") and Jeremie Hoogendorn.  McNeil asked Courtney if Omar was inside, and she said not that she knew but that she had been asleep.  Courtney informed officers there were numerous firearms in the house.  Officers then entered the house and searched for approximately ten minutes.  While searching for Omar in the house, officers observed the following: drug paraphernalia in an open dresser drawer, two long guns propped behind a bedroom door, and numerous long guns under a bed.  Officers secured the guns by unloading them,

3

but did not remove them from the premises.  After the search, police conducted further interviews of Chambers and Courtney in the house for approximately forty-five minutes.  All three individuals were released that morning.

B.    Parker's Investigation of Chambers/Interview with Ms. Courtney

The following information is taken from the Affidavit of Raymond Parker ("Parker Affidavit") in support of the search warrant issued by Magistrate Judge Paul Cleary on May 24, 2004.  On May 19, 2004, Raymond Parker ("Parker"), a Special Agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") was informed by McNeil that officers observed firearms in the residence of Chambers during the search for Omar.  Parker began an investigation regarding Chambers.  Parker interviewed Courtney, who stated that she met Chambers through a friend, began obtaining a type of ammonia to help Chambers manufacture methamphetamine, and eventually moved in with Chambers.  Courtney stated she observed guns in the house as late as May 14, 2004.  Parker independently confirmed that Chambers had a felony drug conviction from 1992 out of Logan County, Oklahoma.  Parker signed an affidavit for search warrant setting forth the above facts regarding observation of firearms during the first search, Courtney's statements, and Chambers' former conviction.  On May 24, 2004, Judge Cleary signed the search warrant.

C.    Second Search of Chambers' Residence

On May 24, 2004, Chambers' residence was searched a second time pursuant to the search warrant.  During this search, the guns and drug paraphernalia forming the basis of the charges against Chambers in this case were seized, and he was subsequently arrested.

4

**Discussion**

A.    Consent to First Search

Defendant moves to suppress all evidence seized during the second search, which was made pursuant to the warrant issued by Judge Cleary.  Defendant argues that evidence seized during the second search was "fruit of the poisonous tree" of the first search, which was unconstitutional because Chambers did not provide voluntary consent.  "Voluntariness of consent to search must be determined by the totality of the circumstances." *United States v. Orrego-Fernandez*, 78 F.3d 1497, 1505 (10th Cir. 1996).  The Government bears the burden of providing that there was no duress or coercion, express or implied, that the consent was unequivocal and specific, and that it was freely and intelligently given. *Id.*  A court may consider physical mistreatment, use of violence, threats, threats of violence, promises or inducements, deception or trickery, and the physical and mental condition and capacity of the defendant in deciding whether the voluntariness of consent. *United States v. McCurdy*, 40 F.3d 1111, 1119 (10th Cir. 1994).

Chambers argues that the "manner of operation and restraint" used upon Chambers rendered his consent involuntary.  Specifically, Chambers argues that the fact of his detention, combined with other facts and circumstances, rendered his consent involuntary.  "The fact of a defendant's detention is a factor to be considered in determining voluntariness, but it is not dispositive.  Valid consent may be given by a person being detained." *United States v. Nicholson,* 983 F.2d 983, 988 (10th Cir. 1993).  Following are examples cited in *United States v. Nicholson* in which consent was voluntary despite the fact of detention: *United States v. Ramirez-Jiminez*, 967 F.2d 1321, 1324 (9th Cir. 1992) (detention at border checkpoint; defendant not threatened, screamed at, or struck, and no evidence of psychological coercion); *United States v. Jackson*, 901 F.2d 83, 84 (7th Cir. 1990) (defendant

5

appeared outside occupied house with hands in pockets; officers sought permission to search pockets, never displayed weapons); *United States v. Moreno*, 897 F.2d 26, 33 (2d Cir. 1990) (defendant apprehended in public area, not abused or threatened, no weapons displayed, consent requested after brief detention); *United States v. Garcia*, 866 F.2d 147, 152 (6th Cir. 1989) (airport stop, two guards, no weapons displayed, no physical contact, no threatening by guards).

Based on the evidence presented at the hearing on this matter, Chambers was handcuffed and sitting in the well house at the time he gave his consent for officers to search the residence. Although he had previously been forcibly restrained on the ground and with weapons drawn, this was not the point in time that Chambers gave consent. Instead, it was several minutes later, after the situation had become more calm and after Chambers had been escorted to a place where he could sit down. The Court finds that, although Chambers was in handcuffs and was therefore detained, this fact alone does not render Chambers' consent involuntary. In this case, officers did not use any violence, threats, promises, trickery, or other forms of intimidation or deception that would render Chambers' consent involuntary. Instead, Chambers' consent was specific, unequivocal, and voluntary.[2] The Court therefore finds that Chambers' consent to search the residence in April of 2004 was not the product of involuntary consent. Accordingly, the facts contained in the Parker Affidavit supporting the second search regarding the guns observed during the first search are not "fruit of the poisonous tree." Instead, such facts were observed by officers conducting a consensual

---

[2] Although Chambers likely intended the search to be limited to searching for Omar, the firearms and drug paraphernalia viewed by officers were in plain view and could be seen during a search for a person. Specifically, the firearms were behind the door in the northwest bedroom, under the bed, and in a closet. The drugs and drug scales were observed in an open dresser drawer in the northwest bedroom. Thus, even assuming the consent was limited to searching for a person, all evidence described in the affidavit for search was in plain view during such a search.

search of Chambers' residence.  They therefore were properly considered by Judge Cleary in issuing

the search warrant that yielded the evidence Chambers seeks to suppress in this motion.

B.      Independent Source Doctrine

        Even assuming Chambers' consent was involuntary and the first search of the house was

illegal, Parker's subsequent interview with Courtney on May 20, 2004 provided an "independent

source" for the information contained in the Parker Affidavit.  *See United States v. Griffin*, 48 F.3d

1137, 1150 (10th Cir. 1995) (evidence tainted by "fruit of the poisonous tree" may nevertheless be

used if evidence introduced was derived from a source independent of the illegal conduct).  Although

Chambers argues that but for the warrantless entry, law enforcement would not have come into

contact with Ms. Courtney, that appears to be factually incorrect.  Prior to conducting the search of

the residence, officers ordered all occupants out of the house.  Courtney came out of the house before

the search began, and informed officers at that time that guns were present in the house.  Parker

would therefore have been aware that Courtney had information regarding Chambers and the

presence of firearms in Chambers' residence regardless of whether the first search was conducted.

C.      Good-Faith Exception

        Even assuming the first search was illegal and the subsequent search warrant lacked support

from an "independent source" such as the Courtney interview, the evidence seized is nevertheless

admissible if officers executing the warrant acted in "good faith," meaning whether a reasonably

well-trained officer would have known the search was illegal despite the magistrate's authorization

of the search.  *United States v. Corral-Corral*, 899 F.2d 927, 932 (10th Cir. 1990).  Even if an officer

acted in good faith, the exclusionary rule still applies if the magistrate issued the warrant on a

deliberately or recklessly false affidavit.  *Id.* at 933.  The Court finds that officers here acted in good-

faith reliance on the search warrant issued by Judge Cleary and that a reasonably well-trained officer would have no reason to suspect or know the search was illegal despite the authorization. To the extent Defendant argues that Parker knew the first search was illegal, and therefore was reckless or deliberate in including information regarding the first search in his Affidavit for search, this argument also fails.  First, the issue of voluntariness of consent is fact-intensive, and there is no evidence to support the inference that Parker acted recklessly or in bad faith in including items viewed during the first search as supporting evidence in the affidavit for the second search.  Second, based on the facts as relayed by McNeil at the evidentiary hearing and as likely relayed by McNeil to Parker, Parker would have no reason to believe that Chambers' consent was involuntary or obtained by force, intimidation, or threats by the officers.

Defendant's Motion to Suppress (Docket No. 24) is DENIED.

**ORDERED this *30* day of DECEMBER, 2005.**

**TERENCE KERN**
**UNITED STATES DISTRICT JUDGE**

8